UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| BRADLEY CADDELL, | § | |
| PLAINTIFF | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:14-cv-2249 |
| | § | |
| | § | JURY DEMAND |
| BRAD LIVINGSTON, WILLIAM STEPHENS, | § | |
| RICK THALER, ROBERT EASON, JEFF | § | |
| PRINGLE, BALDEN POLK, LOUIS | § | |
| WILLIAMS, LANETTE LINTHICUM, | § | |
| PHYLLIS McWHORTER, and the TEXAS | § | |
| DEPARTMENT OF CRIMINAL JUSTICE | § | |
| DEFENDANTS | § | |

**PLAINTIFF'S COMPLAINT**

Plaintiff Bradley Caddell, a former prisoner at the Hutchins State Jail, brings this lawsuit against Defendants because they incarcerated him in dangerously high temperatures, causing him to suffer a heat stroke requiring hospitalization.

STATEMENT OF CLAIMS

1.     Plaintiff Bradley Caddell brings this civil action for compensatory and punitive damages against Defendants Brad Livingston, Robert Eason, Jeff Pringle, Balden Polk, Lanette Linthicum, Phyllis McWhorter, and Louis Williams, in their individual capacities, for violating his civil rights under the Eighth and Fourteenth Amendments of the United States Constitution and 42 U.S.C. § 1983.

2.     Moreover, Plaintiff brings claims for compensatory damages against the Texas Department of Criminal Justice for violating his rights under the Americans with Disabilities Act, 42 U.S.C. § 12131 (ADA), *et seq.*, and Rehabilitation Act of 1973, 29

U.S.C. § 794 ("Rehabilitation Act"), for failing to accommodate his heat-sensitive disabilities.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), and § 1343 (civil rights).

4.      Venue is proper in this district pursuant to 24 U.S.C. § 1391(b), as the events complained of occurred in this district and division.

## PARTIES

5.      Plaintiff Bradley Caddell is a former prisoner at the Hutchins State Jail, and is currently a resident of Brazoria County, Texas.

6.      Defendant Brad Livingston is the executive director of the Texas Department of Criminal Justice (TDCJ). As such, Livingston is the commanding officer of all TDCJ correctional officers, guards, and TDCJ employees and contractors, and is responsible for their training, supervision, and conduct.  By law, he is responsible for protecting the constitutional rights of all persons held in TDCJ custody and the conditions inside TDCJ's prisons.  At all relevant times, Livingston was acting under color of law and as the agent, and, as a matter of law, the official representative of TDCJ.  He is sued in his individual capacity for nominal, punitive, and compensatory damages.

7.      Defendant Robert Eason was the regional director for TDCJ's "Region II," and supervises eleven prisons, including the Hutchins State Jail and the Michael Unit. As the regional director, he is responsible for the supervision of all personnel at the Hutchins State Jail. Eason was acting under color of law and as the agent, as a matter of law, the official representative of TDCJ. He is sued in his individual capacity for punitive and

compensatory damages. Eason is a resident of Anderson County, Texas.

8.      Defendant Rick Thaler was the director of TDCJ's Correctional Institutions Division at all relevant times. The Correctional Institutions Division manages all aspects of TDCJ's prison facilities. As such, Thaler was the commanding officer of all TDCJ correctional officers, guards, and TDCJ employees and contractors, and was responsible for their training, supervision, and conduct in all Institutional Division facilities. By law, he is responsible for protecting the constitutional rights of all persons held in TDCJ custody. At all relevant times, Thaler was acting under color of law and as the agent, and, as a matter of law, the official representative of TDCJ. He is sued in his individual capacity for punitive and compensatory damages. Thaler is a resident of Huntsville, Texas, in Walker County.

9.      Defendant William Stephens was the deputy director of TDCJ's Correctional Institutions Division at all relevant times. As such, Stephens was the direct supervisor of all TDCJ correctional officers, guards, and TDCJ employees and contractors working in TDCJ's prisons, and is responsible for their training, supervision, and conduct in all Institutional Division facilities. By law, he is responsible for protecting the constitutional rights of all persons held in TDCJ custody. At all relevant times, Stephens was acting under color of law and as the agent, and, as a matter of law, the official representative of TDCJ. He is sued in his individual capacity for punitive and compensatory damages. Stephens is a resident of Huntsville, Texas, in Walker County.

10.     Defendant Jeff Pringle was the warden at the Hutchins State Jail at all relevant times.  At all relevant times, Pringle was acting under color of law and as the agent, and, as a matter of law, the official representative of the Texas Department of

Criminal Justice.  He is sued in his individual capacity for damages.

11.     Defendant Balden Polk was the assistant warden at the Hutchins State Jail at all relevant times.  At all relevant times, Polk was acting under color of law and as the agent, and, as a matter of law, the official representative of TDCJ.  He is sued in his individual capacity for damages.

12.     Defendant Lannette Linthicum is a medical doctor, and the director of TDCJ's Health Services Division. The Health Services Division supervises all TDCJ medical providers and is responsible for all policies governing the medical care prisoners receive. Among other things, she is responsible for operational review of medical care provided at all TDCJ prisons. At all relevant times, Linthicum was acting under color of law and as the agent, and, as a matter of law, the official representative of TDCJ.  She is sued in her individual capacity for damages.

13.     Defendant Phyllis McWhorter was the health services liaison for TDCJ at all relevant times. The Health Services Liaison is, among other things, responsible for coordinating the transfer or reassignment of prisoners for medical purposes. At all relevant times, McWhorter was acting under color of law and as the agent, and, as a matter of law, the official representative of TDCJ.  She is sued in her individual capacity for damages.

14.     Defendant Louis Williams supervised prisoners working in the boiler room at the Hutchins State Jail at all relevant times.  At all relevant times, Williams was acting under color of law and as the agent, and, as a matter of law, the official representative of TDCJ.  He is sued in his individual capacity for damages.

15.     The Texas Department of Criminal Justice is the state prison system, an

agency of the State of Texas.  At all relevant times, it operated the Hutchins State Jail and Michael Unit, a public facility with programs and services Caddell was otherwise qualified for.  TDCJ is a recipient of federal funds.  TDCJ is sued for compensatory damages under federal law.

FACTS

16.     Despite knowing that at least ten people with similar medical conditions died the previous summer from heat stroke, including one man at the Hutchins State Jail, and that numerous other prisoners and correctional officers suffered heat-related injuries, Defendants forced Caddell to live in dangerously hot dormitories, and work in the Hutchins State Jail's even hotter boiler room during the blazing hot Texas summer. Though Defendants knew Caddell had medical conditions that substantially increased his risk of heat stroke, they forced him to live and work in extremely hot temperatures anyway. As a foreseeable result, Caddell suffered a heat stroke and had to be hospitalized at Parkland Hospital.

*A.*          *Extreme Temperatures Threaten Prisoners' Health*

17.     According to the National Weather Service, "heat is the number one weather-related killer in the United States, resulting in hundreds of fatalities each year."  On average, heat kills more people than "floods, lightening, tornadoes and hurricanes combined."

18.     According to the NWS, the American Medical Association, the Environmental Protection Agency (EPA), and the Center for Disease Control and Prevention (CDC), "[m]aintaining a consistent internal body temperature, generally 98.6° [Fahrenheit], is essential to normal physical functioning." Excessive heat can "stress the

body's ability to maintain this ideal internal temperature. If individuals fail or are unable to take steps to remain cool and begin to experience increasing internal temperatures, they increase their risk of experiencing a range of potential adverse health outcomes."

19.     High temperatures and humidity prevent the human body from regulating its temperature. When exposed to heat, the heart will beat faster to increase blood flow to the skin, in order to dissipate heat and keep the internal organs from overheating. As the blood circulates to the skin, excess heat escapes into the cooler air. With so much blood pumped to the skin, the body struggles to maintain its normal functions.

20.     Likewise, the body also cools itself through sweating. The body produces sweat, which evaporates to cool the body. But when the humidity is high, the sweat cannot evaporate, preventing the body from cooling. In addition, continued exposure to heat causes the body to lose water and become dehydrated. When the body loses enough water, it also loses oxygen.

21.     Thus, when exposed to high heat and humidity, the body cannot cool itself through sweating and circulation, the body's temperature rises, and heat-related illnesses may develop.

22.     Continued exposure to high heat and humidity can cause permanent injuries to the body, including heat stroke and death. High temperatures can also cause less deadly, but still painful, heat-related illnesses, including heat exhaustion and heat cramps.

23.     **Heat Exhaustion**: Symptoms of heat exhaustion, according to the federal National Institute for Occupational Safety and Health (NIOSH), include fatigue; heavy sweating; nausea; dizziness; elevated body temperature; and fast, shallow breathing.

24.     According to the Mayo Clinic, heat exhaustion can quickly progress to heat

stroke if the person does not cool down quickly.

25.     **Heat Cramps**: Heat cramps can consist of "[m]uscle pain or spasms usually in the abdomen, arms, or legs," according to NIOSH.

26.     Heat cramps are extremely painful. TDCJ's own medical policy recognizes that pain from heat cramps "may be quite severe" and "may occur even at low ambient temperatures."

27.     **Heat Stroke**: NIOSH describes heat stroke as "the most serious heat-related disorder," in which "the body temperature can rise to 106 degrees Fahrenheit or higher within 10 to 15 minutes." Symptoms often include hot, dry skin; hallucinations; chills; headaches; confusion; and slurred speech. "Heat stroke can cause death or permanent disability if emergency treatment is not given." According to resources published online by the Mayo Clinic, "[i]n a period of hours, untreated heatstroke can cause damage to your brain, heart, kidneys and muscles."

28.     In extreme temperatures, heat-related illnesses can arise and exacerbate quickly to cause death. According to NIOSH, "[t]he different forms of heat-related illness … increase in severity as heat strain increases. This allows for a quick, deadly progression from heat exhaustion to heat stroke."

29.     Indeed, TDCJ's own medical policies recognize heat stroke is "a medical emergency," that "the onset is often sudden," and that "death may occur."

B.      *Despite the Danger, TDCJ Does Not Cool Hutchins Unit Housing Areas*

30.     Even though all Texas county jails are required by law to be air conditioned (with temperatures between 65 and 85 degrees), the housing areas at the Hutchins Unit are not climate controlled or air conditioned. *See* 37 TEX. ADMIN. CODE § 259.160.

31.     Air-conditioned housing is available at some TDCJ prisons, but not for minimum custody prisoners (like Caddell) at the Hutchins Unit. Of the 97 state-operated TDCJ prisons, 56 have some air conditioning in inmate living areas. Ironically, solitary confinement cells (including death row) are routinely air-conditioned – at the Hutchins State Jail, summer temperatures in the solitary confinement cells are routinely 20 to 30 degrees cooler than the minimum custody dormitory where Caddell lived.

32.     There is no penological purpose for refusing to air condition inmate housing areas. Prisons in neighboring states, including Arkansas, Oklahoma, and New Mexico, are air conditioned.

33.     Even most maximum-security federal prisons in hot climates, like Texas, are routinely air conditioned. For example, the prison housing terrorism suspects in Guantanamo Bay, Cuba, is air conditioned.

34.     But the ventilation system at the Hutchins State Jail does not lower the indoor temperatures. Rather, the ventilation system just brings in "fresh" hot air from outside, while pumping out "stale" hot air from the inside, much the same way a vent system in a car does not provide any comfort and does not lower the temperature when it is run without the car's air conditioning.

35.     Livingston, Thaler, Stephens, Eason, McWhorter, Pringle, Polk and Williams had long known that temperatures inside the prisoners' housing dormitories were just a degree or two cooler than the outside temperatures.

36.     Livingston has admitted "during the summer months there sometimes is not a large difference between the indoor and outdoor temperatures at TDCJ facilities."

37.     Pringle, Polk, and Williams know that tables inside the inmate housing areas

at the Hutchins State Jail are hot to the touch, and that officers routinely sweat through their uniforms while working at the prison.

38.     Since 1998, at least twenty TDCJ prisoners in facilities around Texas have died of hyperthermia, or heat stroke, as set forth in the table below. At least one man, Larry McCollum, died of heat stroke at the Hutchins Unit.

| Name | Age | Prison | Date of Death | Body Temp. | TDCJ Region | Facts |
|---|---|---|---|---|---|---|
| Archie White | 48 | Robertson | June 29, 1998 | 104.2 | V | Obese, hypertensive, schizophrenic, prescribed tricyclic antidepressants and other medications known to increase risk of heat-stroke |
| Anselmo Lopez | 41 | Eastham | July 14, 1998 | Unk | I | Prescribed psychotropic medications for schizophrenia |
| James Moore | 47 | Unk | July 30, 1998 | 104.1 | Unk | History of paranoid schizophrenia and hypertension, prescribed psychotropic medications, beta-blockers and diuretics |
| Charles Finke, Jr. | 38 | Huntsville | Aug. 8, 1999 | 106 | I | Prescribed anti-depressants, recently arrived from air-conditioned facility |
| John Cardwell | 39 | Allred | Aug. 4, 2001 | 108.5 | V | Prescribed diuretics and psychotropics, spent 2 weeks in ICU, recently arrived |
| Ricky Robertson | 37 | Darrington | July 16, 2004 | 108 | III | Bipolar with depression, prescribed psychtropic medications, |
| James Shriver | 47 | Byrd | Aug. 8, 2007 | Unk | I | History of hypertension, prescribed psychotropics |
| Dionicia Robles | 54 | Byrd | Aug. 13, 2007 | Unk. | I | Prescribed psychotropics, incarcerated less than one month |
| Douglas Hudson | 62 | Gurney | July 25, 2011 | 105 | II | History of hypertension, prescribed medication "known to interfere with heat dissipation," died after 5 days |
| Larry McCollum | 58 | Hutchins | July 28, 2011 | 109.4 | II | Diabetic, prescribed diuretic, found 2:00 am, died 1 week after arrival |
| Thomas Meyers | 46 | Coffield | Aug. 3, 2011 | 105.6 | II | History of hypertension, prescribed psychotropics |
| Robert Webb | 50 | Hodge | Aug. 4, 2011 | Unk. | II | Developmentally disabled, prescribed psychotropics, found unresponsive 3:30 am |
| Alexander Togonidze | 44 | Michael | Aug. 8, 2011 | 106+ | II | Diabetic, prescribed psychotropics, previously complained of heat-related illnesses, collapsed 8:00 am |
| Charles Cook | 53 | Hodge | Aug. 8, 2011 | 107.9 | II | Developmentally disabled, prescribed psychotropics, found unresponsive at 3:00 am |
| Michael Martone | 57 | Huntsville | Aug. 8, 2011 | 106.5 | I | Prescribed psychotropics |
| Kelly Marcus | 36 | Connally | Aug. 12, 2011 | Unk. | IV | Obese, prescribed diuretic, found 3:30 am |
| Kenneth Wayne James | 52 | Gurney | Aug. 13, 2011 | 108 | II | Prescribed diuretic, died 3 days after arrival |
| Daniel Alvarado | 44 | Beto | Aug. 20, 2011 | 105.2 | II | HIV+, prescribed psychotropics, found unresponsive at 9:20 am, incarcerated nine days |
| Rodney Adams | 45 | Gurney | Aug. 3, 2012 | 109.9 | II | Prescribed psychotropics, died 1 day after arrival |
| Albert Hinojosa | 44 | Garza West | Aug. 27, 2012 | Unk. | IV | Died at transfer facility shortly after arrival, found after midnight |

10

35.     These twenty men all shared certain characteristics. As TDCJ knew, they all suffered underlying medical conditions and heat-sensitive disabilities that put them at much greater risk of heat stroke, including taking psychotropic drugs to treat a mental illness, suffering from conditions like obesity or diabetes, or taking diuretics to treat hypertension.[1]

36.     Moreover, it is likely far more TDCJ prisoners were killed by heat because hyperthermia is an underreported cause of death.

37.     Heat can also cause or aggravate other illnesses, even triggering medical emergencies such as heart attacks. According to the World Health Organization (WHO), "heat increases death rates from cardiovascular and respiratory disease by placing extra stress on an already stressed system." Similarly, NIOSH warns that there is substantial evidence that extreme heat is a risk factor for cardiovascular disease and death.

38.     The CDC, NWS, and EPA recognize that sudden exposure to heat contributes to a variety of illnesses, including cardiovascular disease, and increases the likelihood of illness and death.

---

[1] Six wrongful death lawsuits brought by the families of eight of these men are currently

39.     As all Texans know, however, it is not just the temperature but also the humidity that contributes to heat. The heat index is a measure of "apparent temperature," based on ambient temperature and humidity, which the NWS says closely approximates how air temperature is "felt" by the human body. The NWS publishes a chart which illustrates how exposure to high heat indexes increases the risk of heat-related illnesses:



40.     The NWS correlates heat index ranges to risk levels:

a. Caution (light yellow; heat index 80-90° F) - "Fatigue possible with prolonged exposure and/or physical activity."

b. Extreme Caution (mustard yellow; heat index 91-104° F) - "Sunstroke, muscle cramps, and/or heat exhaustion possible with prolonged exposure and/or physical activity."

c. Danger (orange; heat index 105-125° F) - "Sunstroke, muscle cramps, and/or heat exhaustion likely. Heatstroke possible with prolonged exposure and/or physical activity."

      d. Extreme Danger (red; heat index >126° F) - "Heat stroke likely."

41.      The NWS warns that exposure to heat index greater than 105° F "may cause increasingly severe heat disorders with continued exposure or physical activity."

42.      TDCJ incorporates a version of the NWS chart into its policies and training materials, and is well aware of the facts described by the NWS. Like the NWS chart, TDCJ's version recognizes that as the heat index increases, the risk of increasingly severe heat-related illnesses goes up. When the heat index exceeds 90 degrees, according to TDCJ, "heat exhaustion" becomes "possible." Above 105 degrees, "heat stroke" becomes "possible." Above 130 degrees, heat stroke becomes "imminent."

43.      Importantly, the NWS and TDCJ charts are designed to predict the risk to people who *do not* suffer from medical conditions that increase their susceptibility to heat-related injuries. These charts predict the risk to "healthy" people, not people, like Caddell, who have an increased risk of heat-related illness or injury due to medical conditions, medications or age.

44.      Both the NWS and TDCJ charts show that prisoners living in the Hutchins Unit are exposed to indoor heat indexes that put inmates at risk of heat exhaustion, and heat cramps virtually every day of the summer.

45.      At the Hutchins Unit, the heat index values are read aloud over the officers' radios every hour. Thus, every officer with a radio – including Pringle, Polk, and Williams – knew about the extreme temperatures the Hutchins Unit was experiencing in June 2012.

46.      Though TDCJ's policies recognize that escalating extreme temperatures put prisoners at increased danger, TDCJ's policies do nothing to provide additional

protections to inmates in the extremely hot housing areas as apparent temperatures go up.

47.     In fact, TDCJ has no formal, written policy to protect prisoners from extreme temperatures in the indoor inmate housing areas. TDCJ has no policy to lower indoor temperatures in inmate housing areas.

48.     In reality, no mitigation measures short of climate control or a policy to re-locate inmates to cooler housing areas can adequately protect people from these extreme temperatures. Without climate controlled housing, prisoners will inevitably suffer heat-related illnesses and injuries, and be placed at increased risk of death.

49.     In fact, Dr. Charles Adams, M.D., the medical director supervising medical care provided at multiple TDCJ prisons, stated "they need cooling" when he was told a prison's infirmary "ha[d] been inundated with heat related issues."

50.     Thus, predictably, temperatures inside the housing units at TDCJ's prisons, including at the Hutchins State Jail, routinely soar above 100 degrees during the hot Texas summers. And heat indexes routinely exceed 100 degrees, and have been recorded as high as 149 at the Hutchins Unit.

51.     In the summer of 2011, it the temperature exceeded 100 on 63 days between June 1 and August 31 when TDCJ recorded apparent temperatures. TDCJ recorded apparent temperatures of 120, 122, 137, "149+," and 151 on separate days.

52.     Despite this, TDCJ took no measures to cool the temperatures inside the housing areas at the Hutchins Unit. It did not use devices like portable air conditioners, misters, or foggers to decrease the temperature indoors at any time Caddell was there, though it easily could have. In fact, TDCJ has now purchased evaporative coolers for use at the Hutchins Unit.

C.         *Defendants Knew Caddell was at Serious Risk of Injury, But Did Nothing*

53.       On the day of Caddell's heat stroke, the heat index reached the "danger" zone, where heat stroke becomes "possible" even for healthy people not suffering from Caddell's medical conditions.

54.       But TDCJ knew Caddell suffered from medical conditions – hypertension and obesity – that increased his risk of heat-related illness.

55.       Indeed, Mr. McCollum died of heat stroke the summer before Caddell's hospitalization. Defendants Pringle, Polk, and Williams knew about McCollum's death, and knew that he had medical conditions similar to Caddell, but still made no effort to cool the temperatures inside the housing areas, and even failed to prevent prisoners with heat-sensitive medical conditions from working in the boiler room.

56.       Likewise, Defendants Livingston, Stephens, Thaler, Linthicum, McWhorter, and Eason all knew that prisoners with medical conditions like Caddell's were incarcerated in TDCJ's prisons. They knew that extreme temperatures put these prisoners at heightened risk of injury during the extremely hot summers. And they knew McCollum had died at the same prison the past summer.

57.       All the Defendants knew that TDCJ had no policy, practice, or procedure to protect inmates with heat-sensitive disabilities from the extreme temperatures inside the Hutchins Unit's housing areas.

58.       All the Defendants knew that the steps TDCJ took to protect prisoners from extreme temperatures were inadequate because the previous year ten men similarly situated to Caddell, including Mr. McCollum, died in TDCJ prisons from heat stroke.

59.       In the years before Mr. McCollum's death, and Caddell's heat stroke, many

other prisoners and officers working at the Hutchins Unit had suffered heat-related injuries requiring medical treatment. At least one correctional officer had to be hospitalized due to heat stroke. Pringle, Polk, Williams, Eason, Linthicum, and McWhorter knew about these previous injuries at the Hutchins State Jail.

60.     Likewise, Livingston, Thaler, Stephens, Eason, Linthicum, and McWhorter all knew that prisoners and correctional officers were injured or became ill due to the extreme indoor temperatures in TDCJ prisons around the state.

61.     Linthicum even kept a database of heat-related injuries, illnesses, and deaths from around the TDCJ system long before Caddell was hurt. She, as a medical doctor, had particular knowledge that prisoners had been injured or killed by the heat before Caddell, and likely would continue to be injured or killed in the future. And, as a doctor, she knew that patients like Caddell were at particularized risk of heat-related injury.

62.     Because these conditions are so dangerous, even the correctional officers' union has publically decried the extreme temperatures inside the prisons.

63.     Despite these heat-related deaths and injuries at the Hutchins State Jail and throughout the prison system, TDCJ, Livingston, Thaler, Stephens, Eason, Linthicum, and McWhorter deliberately choose to continue to house people with heat-sensitive disabilities there without providing any climate control in the housing areas.

64.     In fact, the only policies TDCJ has to protect prisoners from heat limits outdoor forced labor on extremely hot days. But the policy, which Livingston, Thaler, Stephens, Eason, and Linthicum were aware of, authored, and/or implemented, does not address safe housing, or even indoor forced labor (like in the boiler room).

65.     Even though TDCJ's healthcare policies, which Linthicum helped draft and

implement, plainly state that prisoners with conditions like Caddell's are at increased risk of heat-related illness or injury, none of the Defendants did anything to ensure Caddell was not assigned to a dangerously hot housing area.

66.     None of TDCJ's policies, which Livingston, Linthicum, Thaler, and Stephens are responsible for approving, prohibit housing prisoners with heat-sensitive medical conditions in the extremely hot housing areas.

67.     Instead, all the Defendants know the measures TDCJ does employ are obviously inadequate. TDCJ provides just one 10 gallon jug of water, for example, for each 54-man inmate dormitory during the summer. Even this minimal water is rarely cold, and is completely inadequate. The jugs are not refilled constantly, and empty rapidly as thirsty inmates gulp down the water.

68.     At the Hutchins State Jail, all the Defendants know prisoners cannot have personal fans because the bunk areas do not have electrical outlets. Though prisoners in many other TDCJ facilities have personal fans, TDCJ does nothing to allow prisoners to use personal fans at the Hutchins State Jail.

69.     Likewise, all the Defendants know the windows in the inmate housing areas at the Hutchins State Jail do not open. This decreases ventilation and prevents any breeze even possibly bringing down the indoor temperatures.

70.     However, TDCJ does cool the agricultural barns where pigs are raised for slaughter because it is concerned the pigs will get sick and die before they become mature agricultural products. TDCJ's policies require pigs live in a "comfortable environment with ventilation." Misters begin to cool the pigs when the temperature goes above 74 degrees to keep the pigs "comfortable." TDCJ policy requires temperatures be

no higher than 85 degrees to ensure "pig comfort." TDCJ policies even establish an "upper critical limit" for pigs at 95 degrees, and require "some form of cooling" for the pigs when temperatures exceed 95.

71.     Livingston approved the purchase of the climate-controlled pig barns, and the policies requiring pigs be kept in "comfortable" temperatures, but knows no similar protections exist for prisoners.

72.     TDCJ and Director Livingston even chose to air condition the Hutchins State Jail's armory, rather than prisoner housing areas, because of concerns the prison's weapons would be damaged by the heat.

73.     All TDCJ employees, including Livingston, Stephens, Thaler, Eason, Pringle, Polk, McWhorter, and Williams, were trained "heat stroke occurs when the body is subjected to more heat than the body can possibly handle. Heat stroke is a serious medical condition and may lead to death without immediate emergency medical attention. In heat stroke, body temperature rises too quickly resulting in the death of body tissue."

74.     TDCJ officials, like Livingston, Thaler, Stephens, Eason, Pringle, Polk, Linthicum, McWhorter, and Williams, knew "victims of prolonged or high heat can develop heat cramps or heat exhaustion.  If heating continues, the condition can progress to a heat stroke and death."

75.     Finally, in 2014, after facing multiple wrongful-death lawsuits, TDCJ began to install evaporative cooling units in housing areas at the Hutchins Unit. But TDCJ knows this half-measure will not work. In fact, TDCJ even testified in other litigation that "it would not work" to cool the housing areas at the Hutchins Unit.

E.      *Hutchins Unit Officials Increased Caddell's Risk by Forcing him to Work in the Boiler Room*

75.     Because of the dangers extreme heat poses, TDCJ allegedly prohibits prisoners with certain medical conditions, including obesity and hypertension, from working outdoors in "extreme temperature" environments. TDCJ asks its medical provider, the University of Texas Medical Branch, to identify prisoners with conditions that increase the risk of heat-related illness who are unable to work in hot environments.

76.     Due to his heat-sensitive medical conditions, UTMB recommended TDCJ not force Caddell to work in hot environments.

77.     But Williams, Polk, and Pringle ignored this recommendation, and assigned Caddell to forced labor in the prison's boiler room – the hottest job assignment at the prison.

78.     There are many jobs TDCJ could have assigned Caddell that did not require him to work in an extremely hot environment like the boiler room. Among many other available jobs, TDCJ could have made Caddell a janitor working in the administration building, which is air conditioned (and where the wardens' offices are located). But TDCJ, Pringle, Polk, and Williams made no such accommodation.

F.      *Caddell was at Increased Risk of Heat Stroke Due to his Disabilities*

   i.   *Caddell was Obese*

79.     At the time of his heat stroke, Caddell was a fifty-one year old man, who weighed 262 pounds and was 5'5" tall.

80.     According to the Centers for Disease Control, his body mass index was 43.6.

81.     A body mass of 30 or more means a patient is clinically obese, and a BMI of 40 or more means a patient is morbidly obese. Caddell's weight was clearly outside the

normal range for a person of his height, and severely affected his health.

82.     Caddell's obesity was also a cause of, or contributed to, his hypertension, and thus substantially limited his cardiovascular system.

83.     Caddell's obesity substantially limited his ability to cool, sweat, walk, stand, breathe, and sleep. His obesity made him unable to safely work in certain environments, like an extremely hot boiler room.

ii.     *Caddell Suffered from Hypertension*

84.     Doctors in the prison system diagnosed Caddell as suffering from hypertension.

85.     Hypertension is a cardiovascular disease. It is the leading cause of stroke, and a major cause of heart attacks. Serious damage is caused to the cardiovascular system when blood flow asserts high pressure on artery walls. Hypertension is often called "the silent killer." It can cause breathing problems, and result in organ damage if untreated or exacerbated.  Hypertension also causes severe headaches, fatigue, obesity, and vision problems. It is a physiological condition affecting body systems, including the respiratory and cardiovascular systems.

86.     Thus, UTMB doctors prescribed him Enalapril, a beta blocker, and hydrochlorothiazide, a diuretic, to treat his hypertension.

87.     Beta blockers prevent the body from dissipating heat, putting hypertensive patients prescribed these drugs at greater risk of heat stroke.

88.     Diuretics also prevent heat dissipation by removing water from the blood to decrease blood pressure. Diuretics thus increase the risk of heat stroke.

89.     As a consequence, UTMB and TDCJ policies recognize patients taking

diuretics and beta blockers to treat hypertension are at increased risk of heat-related illness, and "should not be allowed to work or recreate in environments where the apparent air temperature is 95 [degrees] or higher."

90.     As one would expect, hypertension, combined with Caddell's history of obesity, substantially limited his ability to climb, walk, stand, and breathe, and limited the operation of his respiratory, circulatory, and cardiovascular systems. His medication was necessary to protect his health from his disability.

91.     As was well known to each of the Defendants through training, prior to Caddell's heat stroke, hypertension itself also increases a patient's susceptibility to heat stress, and, combined with extreme heat, diminishes the body's ability to regulate internal temperature.

G.     *Defendants Exposed Caddell to Extreme Danger*

92.     On July 21, 2011, Larry McCollum died of heat stroke at the Hutchins State Jail. All the Defendants knew about his death from heat stroke due to lack of air conditioning, and that other prisoners like him at the Hutchins Unit were in danger.

93.     Throughout the summer of 2011, as men began to die throughout the TDCJ system, Caddell continued to live in the extremely hot dormitories.

94.     All the Defendants knew about the shockingly high number of deaths due to heat stroke throughout TDCJ, but despite this knowingly made multiple misrepresentations under oath denying that people had died.

95.     Despite knowing Caddell could not work in "extreme temperatures," and knowing he was at extreme risk of injury, Williams assigned Caddell to work in the boiler room in the fall of 2011 because of Caddell's experience working with boilers in

the outside world. TDCJ forced him to work in the hottest part of the prison because they did not want to train another prisoner how to operate the boilers.

96.      In 2012, TDCJ began putting white armbands on prisoners at the Hutchins Unit with heat-related medical conditions.

97.      In the summer of 2012, while he was at work in the boiler room, a TDCJ sergeant brought a white armband to Caddell and put it on him in the boiler room. Caddell continued to wear the armband throughout his time at the Hutchins Unit.

98.      Though Caddell was wearing a white armband, and TDCJ, Williams, Pringle, and Polk and all the Defendants knew what this signified, they continued to force him to work in the boiler room during the summer of 2012.

99.      Caddell's shift in the boiler room was from 2 pm to 10 pm each day.

100.     On June 29, 2012, Caddell finished his shift at 10 pm, and went back to the housing area to go to sleep. He felt weak and sick from the heat. He took a shower to try and cool off, but the water was not cold and did not help. TDCJ does nothing to cool the water in the showers.

101.     On June 30, 2012, the temperature outside was 97 degrees with a heat index over 101, and was likely far hotter inside the boiler room. The temperature outside had been above 97 for ten days before Caddell's heat stroke, and over 100 the previous two days. All the Defendants knew conditions at the Hutchins Unit were dangerous, and inmates were experiencing extreme heat there at this time.

102.     Around 2 am on June 30, 2012, Caddell woke up and still felt extremely hot. He went to try to take another shower to cool off. An officer stopped him and threatened to discipline him for trying to shower in the middle of the night, though prisoners were

supposed to have continual access to showers during the hottest parts of the summer. Pringle and Polk knew that their officers were not allowing prisoners to shower at night.

103.     Caddell woke up again at 6 am. Though the officer the night before told him prisoners could not shower until 9 am, he still felt very sick and hot, and knew he needed to cool off. He waited for the officers to change shifts, and quickly took a short shower to try and cool off. He still felt very sick after this shower, which did not help.

104.     At around 2 pm, Caddell took yet another shower. He still felt very sick, but reported to his job in the boiler room. He told his supervisor he needed to go to the prison's clinic. His supervisor let him go because he was so obviously ill and needed medical attention.

105.     When he got to the clinic, he told the nurse who examined him that he felt hot, and had been feeling sick since the night before.

106.     Caddell sat in the air-conditioned infirmary for an hour, waiting to have his vital signs taken. When his temperature was finally recorded, his body temperature was still 100 degrees, even after cooling off for an hour. The nurses began treating him with cold fluids and kept him in the air-conditioned infirmary, but his temperature actually went up to 101.5.

107.     As his condition worsened, it became obvious the medical staff at the Hutchins State Jail could not adequately treat him. Finally, at 6:30 pm, nurses called 911 and he was sent to the emergency room.

108.     At Parkland Hospital, doctors diagnosed Caddell as suffering from heat stroke and dehydration. He remained hospitalized until 10:30 pm, receiving cool fluids through an IV, before being discharged back to the Hutchins State Jail.

109.    When he returned to the prison, TDCJ officials kept him in the lieutenant's air-conditioned office for the rest of the night.

110.    A lieutenant told Caddell that officers at the highest level of the agency – including Livingston – decided he would no longer be working in the boiler room.

111.    On July 2, 2012, two days after his hospitalization, UTMB discontinued his prescription for hydrochlorothiazide.

112.    On July 6, 2012, Caddell saw a doctor employed by UTMB at the prison for "transfer to a [prison] with air conditioning." Because of his recent heat stroke, UTMB recommended he be "transferred to a unit with air conditioning since patient has heat restriction and also due to age, [hypertension], [Hepatitis C], obesity and recent dehydration and heat stroke."

113.    But, against UTMB's recommendation, TDCJ sent him to another prison without air conditioning, the Michael Unit, where another prisoner (Alexander Togondize) had died of heat stroke the summer before.

114.    Shortly after his heat stroke, Linthicum was notified Caddell had suffered a heat-related injury and had to be hospitalized. Despite knowing he suffered a heat-related injury, and that he was still taking a beta blocker, she did nothing to protect him from further exposure to extremely high temperatures.

115.    Linthicum, Livingston, Eason, Thaler, and Stephens all knew that TDCJ simply does not have enough climate controlled cells to protect all the prisoners who are at increased risk of heat-related injury or illness, and could not accommodate prisoners like Caddell even when instructed to do so by UTMB.

116.    In fact, Dr. Glenda Adams, one of the senior medical providers at UTMB

who has previously been designated as an expert witness for TDCJ, testified as follows:

> Q: So that Utilization Review Committee is really performing some sort of triage situation, is that right?
>
> A: Pretty much. That's a fair description.
>
> Q: Do you know how many of those triage beds or cells you're talking about?
>
> A: How many are there?
>
> Q: Yeah.
>
> A: Absolutely … there were 471 [in 2011]. We now have 481.[2]
>
> Q: Well, do you think that's enough to protect the prisoners who are susceptible to extreme heat or are especially vulnerable to extreme heat?
>
> A: No, but it's all we have.
>
> Q: I understand that. And what you're telling me is 'look, this is an impossible situation. We have to evaluate really serious conditions on down and perform almost like a M.A.S.H. unit would in war to determine who gets these 481 beds,' right?
>
> A: Essentially, yes.

117.    Upon information and belief, McWhorter was TDCJ's health services liaison when UTMB recommended Caddell be transferred to an air-conditioned facility. As the health services liaison, McWhorter's job was to review every medical-related request to change a prisoner's housing assignment. She reviewed UTMB's instruction that Caddell needed air-conditioned housing, and denied it, even though she knew he recently was hospitalized for a heat-related injury.

---

[2] Dr. Adams testified about the beds available to the University of Texas Medical Branch, which provides healthcare to the majority of TDCJ prisoners. The Texas Tech University Health Science Center, which also provides care to TDCJ inmates, has additional beds available. Together, the UTMB and Texas Tech beds total 551.

118.    While at the Michael Unit, Caddell continued to experience symptoms of exposure to extreme temperatures, including headaches, dizziness, nausea, vomiting, and difficulty concentrating and remembering.

119.    Throughout the rest of his incarceration, each summer Caddell remained in pain and was at risk from exposure to extremely hot prisons, despite UTMB's recommendation. He experienced intense mental anguish while he worried that the heat would kill him.

120.    TDCJ intentionally discriminated against Caddell due to his disabilities by forcing him to work in the boiler room, and by denying him safe housing and forcing him to live in the extremely hot dorms, and denying him access to air conditioning when it was specifically recommended by TDCJ's medical provider. The extreme heat denies people with disabilities like Caddell access to TDCJ's facilities, and intentionally causes them to suffer more pain and punishment than prisoners without heat-sensitive disabilities.

CAUSES OF ACTION

I.   EIGHTH AND FOURTEENTH AMENDMENT CONDITIONS OF CONFINEMENT
(As to Defendants Livingston, Thaler, Stephens, Eason, Pringle, Linthicum, McWhorter, Williams, and Polk Only, in Their Individual Capacities)

119.    Plaintiff incorporates the previous paragraphs as if alleged herein, and further pleads:

120.    By subjecting Caddell to these extreme conditions of confinement, specifically excessive heat, with full knowledge of the dangerousness of those conditions, Defendants Livingston, Thaler, Stephens, Eason, Pringle, McWhorter, Williams, and Polk

acted with deliberate indifference to Caddell's serious health and safety needs, in violation of his rights under the Eighth and Fourteenth Amendments to the United States Constitution.

121.    The extreme temperatures Defendants tolerated at the Hutchins State Jail proximately caused Caddell to suffer injuries, namely, the heat stroke, and pain and suffering from continued exposure to high temperatures.

122.    Moreover, Defendants Pringle, Polk, and Williams forced Caddell to work in the boiler room, despite knowing the temperatures inside the boiler room were even more dangerous and that Caddell was medically prohibited from working in "extreme temperatures," and caused Caddell to suffer injuries, namely, the heat stroke.

123.    Despite instructions from TDCJ's own doctors, McWhorter, and Linthicum knew that TDCJ was not providing the housing assignment Caddell needed, and intentionally housed him at the Michael Unit where they knew he would continue to suffer substantial risks of serious harm.

124.    Likewise, Livingston, Thaler, Stephens, and Eason knew that TDCJ did not have enough beds to accommodate even those prisoners who had previously suffered a heat-related illness or injury, and but intentionally continued to deny safe conditions of confinement to prisoners like Caddell.

125.    Plaintiff brings these claims through 42 U.S.C. § 1983.

### AMERICANS WITH DISABILITIES ACT, AMERICANS WITH DISABILITIES ACT AMENDMENT ACT AND REHABILITATION ACT
#### (As to Defendant TDCJ Only)

126.    TDCJ has been, and is, recipients of federal funds, and thus covered by the mandate of the Rehabilitation Act. The Rehabilitation Act requires recipients of federal monies to reasonably accommodate persons with disabilities in their facilities, program

activities, and services and reasonably modify such facilities, services and programs to accomplish this purpose. 29 U.S.C. § 794 (2008).

127.    Further, Title II of the ADA, and the Americans with Disabilities Act Amendments Act applies to TDCJ, and has the same mandate as the Rehabilitation Act.  42 U.S.C. § 12131 *et seq.* (2008).

128.    The Hutchins Unit is a facility, and its operation comprises a program and service, for Rehabilitation Act, ADA, and ADAAA purposes. Caddell was otherwise qualified to participate in the programs and services at the Hutchins State Jail provided by TDCJ.

129.    For purposes of the ADA, ADA Amendments Act, and Rehabilitation Act, Caddell was a qualified individual regarded as having a physiological impairment that substantially limited one or more of his major life activities. Defendant TDCJ knew Caddell suffered from hypertension, and was prescribed diuretic medications. He was also morbidly obese. Each of these conditions, alone or in combination, made Caddell a qualified individual with a disability. Despite this knowledge, TDCJ's officers intentionally discriminated against him, under the meaning of the ADA, ADAAA and Rehabilitation Act, by failing and refusing to protect him from the extreme temperatures that injured him, and failing and refusing to make reasonable accommodations to safely house him.

130.    As alleged above and herein, TDCJ failed to and refused to reasonably accommodate Caddell's disability while in custody, in violation of the ADA, ADAAA and Rehabilitation Act.  That failure and refusal caused him injury.

131.    As alleged above, TDCJ failed, and refused to reasonably modify its facilities, services, accommodations, and programs to reasonably accommodate Caddell's disability.

These failures and refusals caused his heat stroke, and to suffer even after UTMB recommended he be housed in an air-conditioned environment.

132.    As alleged above, TDCJ intentionally discriminated against Cadell because it knew he suffered from heat-sensitive disabilities but failed to make a reasonable accommodation for him.

133.    Among other things, TDCJ chose not to:

    a.  Provide safe housing;

    b.  Provide access to climate-controlled housing;

    c.  Provide Caddell with a fan;

    d.  Provide Caddell access to the prison labor program under safe conditions; and,

    e.  Assign Caddell to a climate-controlled facility when medically indicated.

134.    As Caddell was injured as a direct and proximate result of TDCJ's intentional discrimination against him, he is entitled to all damages allowed by law.

DAMAGES

135.    As the actions and omissions of Defendants, their agents, employees, and/or representatives, proximately caused and/or were the moving force of the injuries and damages to Plaintiff, he asserts claims under 42 U.S.C. § 1983, the ADA and Rehabilitation Act as specifically pled herein.

136.    Plaintiff has incurred damages including, but not limited to, the following:

    •   past and future mental anguish;

    •   past medical expenses;

    •   past and future impairment;

- past and future physical pain and suffering; and;

- attorneys' fees and costs pursuant to 42 U.S.C. §1988, the ADA and Rehabilitation Act, or as allowed by law.

## ATTORNEYS' FEES AND COSTS

137.    Pursuant to 42 U.S.C. § 1988, Plaintiff is entitled to recover attorneys' fees and costs.  Plaintiff also request attorneys' fees, costs, and expenses against TDCJ and UTMB for the ADA, ADAAA, and Rehabilitation Act claims, pursuant to 42 U.S.C. § 12205.

## PRAYER FOR RELIEF

THEREFORE, Plaintiff requests that the Court:

A.    Award compensatory damages against Defendants;

B.    Award punitive damages against individual Defendants only;

C.    Find that Plaintiff is the prevailing party in this case and award him attorneys' fees, court costs, expert costs, and litigation expenses; and,

D.    Grant such other and further relief as appears reasonable and just, to which Plaintiff may be entitled.

Dated: June 20, 2014.

Respectfully submitted,

The Edwards Law Firm
The Haehnel Buidling
1101 East 11th Street
Austin, Texas 78702
Tel.     512-623-7727
Fax.     512-623-7729

By____/s/ Jeff Edwards_____
JEFF EDWARDS
State Bar No. 24014406
*Lead Counsel*
Scott Medlock
State Bar No. 24044783
Sean Flammer
State Bar No. 24059754

31